## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BROCKTON RETIREMENT BOARD and QUINCY RETIREMENT BOARD, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>v.<br><br>OPPENHEIMER GLOBAL RESOURCE PRIVATE EQUITY FUND I, L.P., OPPENHEIMER ASSET MANAGEMENT, INC., OPPENHEIMER ALTERNATIVE INVESTMENT MANAGEMENT, LLC, OPPENHEIMER & CO. INC., BRIAN WILLIAMSON AND PATRICK KANE<br><br>     Defendants. | No. 1:12-cv-10552-RWZ<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>INTRODUCTION</u>

The Brockton Retirement Board ("Brockton") and the Quincy Retirement Board ("Quincy" and together with Brockton, "Plaintiffs") who were appointed Lead Plaintiffs by this Court's Order dated June 11, 2012, by their undersigned attorneys, allege upon personal knowledge as to their own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through their counsel, which included, among other things, a review of Defendants' documents and announcements issued in connection with the private placement of limited partnership units in Oppenheimer Global Resource Private Equity Fund I, L.P. ("OGR Fund" or the "Fund"), wire and press releases published by and regarding the OGR Fund, advisories about the OGR Fund, other information readily obtainable in the public domain and non-public information provided by a confidential witness with direct and actual knowledge

1

of the information contained in this Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint").

## I.   NATURE OF THE ACTION

1.      This is a securities class action brought on behalf of investors who purchased limited partnership units (the "Limited Partnership Units") in the OGR Fund pursuant to a private placement memorandum dated July 2008 (the "OGR PPM") and related marketing presentations and documents (collectively, with the OGR PPM, the "Solicitation Documents") that included materially untrue statements and/or omitted material facts necessary to be stated to make the statements not materially untrue as discussed herein.  These Limited Partnership Units qualify as "securities" pursuant to the Federal Securities laws[1] and this action asserts violations of the Securities Act of 1933 (the "1933 Act") based on theories of strict liability and negligence – ***not fraud*** – against the OGR Fund, certain of its affiliates and its managers (collectively, Defendants).

2.      The OGR Fund is a private equity limited partnership functioning as a global "fund of funds" which invests in limited partnership interests and other investments.  From the outset, the OGR Fund was heavily invested in the private equity fund Cartesian Investor-A ("Cartesian").  The OGR Fund's audited financial statements show that as of December 31, 2008, 41.3 percent of the OGR Fund's capital was invested in Cartesian.  The assets of Cartesian consisted solely of shares in S.C. Fondul Proprietatea SA ("Fondul").  Fondul was created in 2005 by the Romanian government to compensate its citizens whose property had been unlawfully seized or otherwise misappropriated by the former Communist government of Romania.

---

[1] Limited Partnership Units qualify as securities where, as here, they reflect an investment of money in a common enterprise in which the investor has an expectation of profits to come from the efforts of others.

3.     Defendants, through the Solicitation Documents, gave potential investors clear and explicit guidance on how the OGR Fund assets were to be valued, stating, *inter alia*, that: *"the General Partner expects that in most cases it will value the Underlying Funds in accordance with the valuations reported to it by the Managers of the Underlying Funds,"* and that *"[a]s a fund of funds, we require our underlying fund managers to utilize third party valuation firms that provide valuations of the respective portfolios in accordance with FASB 157."* Specifically, FASB 157 states that a *"quoted price in an active market provides the most reliable evidence of fair value and shall be used to measure fair value whenever available."*[2]

4.     Initially, Defendants did abide by these clearly stated valuation policies and appraised all of the OGR Fund's holdings in accordance with the valuation reported by the underlying funds, which in the case of Cartesian, was cost basis and/or trading price of its Fondul shares.  This would change, however, due to an aggressive marketing campaign for the OGR Fund which was initiated no later than October 29, 2009 and ran through June 30, 2010 (the "Marketing Period").  During the Marketing Period, Defendants valued the Cartesian assets through their own internal, undisclosed valuation methodology that resulted in these assets being appraised at multiples of their trading price on the open market, in direct violation of its representations to investors, as well as Securities and Exchange Commission ("SEC") and Financial Accounting Standards Board ("FASB") rules.

5.     This change in valuation methodology, and its huge impact on the reported performance of the OGR Fund, caused the stated return of the OGR Fund to be vastly overstated.  For example, on October 7, 2009, immediately prior to the Marketing Period, Defendants

---

[2]  All emphasis throughout this Complaint is added, unless otherwise stated.

distributed to *current* investors in the OGR Fund a Q2 2009 Quarterly Package (the "Q2 2009 Report").  This Pre-Marketing Period Report contained the following chart:

**Oppenheimer Global Resource Private Equity Fund**
**June 30, 2009**

| Fund Name | Commitment Date | Committed Capital | Contributed Capital | % Capital Contributed | Realized Proceeds | Net Asset Value* | Net Multiple | Net IRR (%) |
|---|---|---|---|---|---|---|---|---|
| Blue Tip Energy Partners Fund I, L.P. | Apr-08 | $ 7,000,000 | $ 2,403,032 | 34% | $ 10,613 | $ 2,118,146 | 0.9x | -13.1% |
| Cartesian Investors-A, L.P. | Jun-08 | $ 7,000,000 | $ 6,196,464 | 89% | $ 95,313 | $ 6,050,690 | 1.0x | -1.0% |
| Starwood Energy Infrastructure Fund I, L.P. | May-08 | $ 7,000,000 | $ 1,050,000 | 15% | $ - | $ 950,947 | 0.9x | -18.3% |
| Tripod Capital China Fund II, L.P. | Oct-08 | $ 7,000,000 | $ 4,210,874 | 60% | $ - | $ 4,999,930 | 1.2x | 40.0% |
| **Total - Net to Fund** | | **$ 28,000,000** | **$ 13,860,370** | **50%** | **$ 105,926** | **$ 14,119,713** | **1.02x** | **3.8%** |
| | | | | | | **Net to Limited Partners** | **0.95x** | **-6.3%** |

\* Net Asset Values are based on the underlying managers' estimated values as of June 30, 2009.

6.      As this chart shows, *current* investors in the OGR Fund were informed on October 7, 2009 that the Cartesian fund showed an internal rate of return ("IRR") of -1% and a net asset value ("NAV") of $6,050,690 as of June 30, 2009.[3]  This valuation reflected the underlying fund manager's at-cost valuation of the Fondul shares in accordance with FASB 157.  Using this valuation of Cartesian, and through it Fondul, the OGR Fund displayed a net loss to investors of -6.3%.  The Q2 2009 Report stated that NAVs "are based on the underlying managers estimated values as of June 30, 2009."

7.      Shortly after the release of the Q2 2009 Report, and without informing investors, Defendants changed the valuation methodology for the Cartesian holdings in order to facilitate

---

[3] Net Asset Value is a fund's price per share or unit, calculated by dividing the total value of all securities in the portfolio, less any liabilities, by the number of fund shares outstanding.  Internal Rate of Return is a measure of a fund or portfolio's performance and potential for future cash flows.  An Internal Rate of Return of 0.00 is where the present value of future cash flows is equal to the cost of investment.

its marketing initiative.  Defendants did this by valuing the Cartesian holdings at their par value of 1.00 Romanian Leu ("RON"), while Fondul shares were being valued at cost by the fund's manager and trading over-the-counter ("OTC") for less than 0.25 RON.  Indeed, in a PowerPoint presentation distributed to *potential* investors in late October 2010, Defendants reported robust performance of the  Fund's Cartesian assets for the same period – *i.e,*  Q2 2009:

## Oppenheimer Global Resource Private Equity Fund
## June 30, 2009

| Fund Name | Commitment Date | Committed Capital | Contributed Capital | % Capital Contributed | Realized Proceeds | Net Asset Value* | Multiple | IRR (%) |
|---|---|---|---|---|---|---|---|---|
| Blue Tip Energy Partners Fund I, L.P. | Apr-08 | $ 7,000,000 | $ 2,403,032 | 34% | $ 10,613 | $ 2,118,146 | 0.9x | -13.1% |
| Cartesian Investors-A, L.P. | Jun-08 | $ 7,000,000 | $ 6,196,464 | 89% | $ 95,313 | $ 9,272,956 | 1.5x | 67.0% |
| Starwood Energy Infrastructure Fund I, L.P. | May-08 | $ 7,000,000 | $ 1,050,000 | 15% | $  · | $ 950,947 | 0.9x | -18.3% |
| Tripod Capital China Fund II, L.P. | Oct-08 | $ 7,000,000 | $ 4,210,874 | 60% | $  · | $ 4,999,930 | 1.2x | 40.0% |
| Total | | $ 28,000,000 | $ 13,860,370 | 50% | $ 105,926 | $ 17,341,979 | 1.3x | 38.3% |

\* Unrealized Values are based on the underlying managers' estimated values as of June 30, 2009.

8.     This chart is in nearly all ways identical to the chart featured in the Q2 2009 Report.  It offers OGR Fund performance up to June 30, 2009.  It contains identical values for Blue Tip Energy Partners Fund I, L.P., Starwood Energy Infrastructure Fund I, L.P., and Tripod Capital China Fund II, L.P. and contains a footnote stating that NAVs "are based on the underlying managers' estimated values as of June 30, 2009."   However, one difference is immediately apparent*: **Cartesian shows an IRR of positive 67 percent, rather than negative 1 percent and an asset value of $9.27 million instead of $6.05 million.**  Using these numbers, the OGR Fund as a whole shows a **positive** IRR of 38.3 percent rather than a **negative** IRR of 6.3

percent.  The valuations and IRRs all changed, despite the fact that this chart involved the same assets over the same time period and should have involved the same returns.

9.      Indeed, throughout the Marketing Period, Defendants solicited investments in the OGR Fund through materially untrue Solicitation Documents that touted the Fund's strong financial performance, NAV and IRR, without disclosing to investors that the valuation methodology used to arrive at those figures with regards to the Cartesian assets was materially different from the methodology it purported to be using in the Solicitation Documents.

10.     On February 24, 2012, THE WALL STREET JOURNAL[4] reported that the SEC and the Massachusetts Attorney General's Office were investigating the OGR Fund because of its undisclosed valuation methodology used for its Cartesian holdings.  Moreover, the article reported that the "potential exaggeration" of asset value began during a marketing initiative in 2009 and helped push the Fund's reported IRR to 38 percent, after fees, ***from a loss of 6.3 percent***.  On March 6, 2012, Oppenheimer Holdings Inc. filed with the SEC a Form 10-K, in which it announced that it had been responding to information requests from the SEC and the Massachusetts Attorney General's Office since October 2011 regarding the OGR Fund.

11.     As a result of the materially untrue statements in the Solicitation Documents regarding the value of OGR Fund's holdings, Plaintiffs and other members of the Class invested in the OGR Fund based on the untrue representation that the Fund had a positive rate of return when, in fact, it had a negative rate of return with large imbedded losses.  As such, Plaintiffs invested at an inflated price not reflecting the true value of their Limited Partnership Units and suffered significant damages.  As a result of this action, Plaintiffs and the Class seek rescission of their purchases in the OGR Fund.

---

[4] Gregory Zuckerman, "Private-Equity Fund in Valuation Inquiry," THE WALL STREET JOURNAL, FEBRUARY 24, 2012.

## II.     JURISDICTION AND VENUE

12.     The claims alleged herein arise under Sections 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77l(a)(2) and 77o, and the rules and regulations of the SEC promulgated thereunder.

13.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a).

14.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) and 28 U.S.C. § 1391(d), as many of the acts and practices complained of herein occurred in substantial part in this District.  Plaintiffs are also residents of this District and were injured in this District.

15.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate electronic communications, interstate telephone communications and the facilities of the national securities markets.

## III.     PARTIES

16.     Plaintiff Brockton Retirement Board is a public retirement system representing current and former employees of the City of Brockton, Massachusetts.  Brockton invested $5.0 million in the OGR Fund pursuant to the materially untrue Solicitation Documents and has been damaged thereby.

17.     Plaintiff Quincy Retirement Board is a public retirement system representing current and former employees of the City of Quincy, Massachusetts.  Quincy invested $7.0 million in the OGR Fund pursuant to the materially untrue Solicitation Documents and has been damaged thereby.

18.     Defendant OGR Fund is a Delaware limited partnership with its principal place of business located in New York, New York.  The OGR Fund is a fund of private equity funds with an emphasis on investments in companies with natural resources and energy related assets.

19.     Defendant Oppenheimer Asset Management, Inc. ("OAM" or the "Sponsor") is a New York corporation with its principal place of business in New York, New York.  OAM is the OGR Fund's Sponsor and an SEC registered investment advisor.  OAM provided the Fund with investment advice, along with the Fund's General Partner and Defendants Williamson and Kane.

20.     Defendant Oppenheimer Alternative Investment Management, LLC (the "OAIM" or the "General Partner") is a Delaware limited liability company with its principal place of business located in New York, New York.  OAIM is the OGR Fund's General Partner, an affiliate of OAM and an SEC registered investment advisor.  OAIM provided the Fund with investment advice, along with the Fund's Sponsor and Defendants Williamson and Kane.

21.     Defendant Oppenheimer & Co. Inc. ("OPCO" or the "Administrator") is a New York corporation with its principal place of business in New York, New York.  OPCO served as the administrator for the OGR Fund, is a broker dealer and an SEC registered investment advisor.  OPCO is an affiliate of OAM and receives a management fee from the OGR Fund equal to (i) 1.00 percent of the aggregate private equity commitments attributable to Class A Units held by direct investors in the Fund; (ii) 1.00 percent of the aggregate capital contributions made from the OGR Fund attributable to Class C/A Units therein held by the OGR Fund; (iii) 0.75 percent of the aggregate private equity commitments attributable to Class B Units held by direct investors in the Fund; and (iv) 1.00 percent of the aggregate capital contributions made from the OGR Fund attributable to Class C/B Unites therein held by the OGR Fund.

22.     Defendants OAM, OAIM, and OPCO are collectively referred to herein as the "Corporate Defendants."

23.     The Corporate Defendants, because of their position of control and authority over the OGR Fund, were able to and did control the contents of the Solicitation Documents during the Marketing Period.  Each Corporate Defendant had the ability and/or opportunity to prevent the issuance of untrue Solicitation Documents or cause them to be corrected.  Accordingly, each of the Corporate Defendants is responsible for the accuracy of these documents and are primarily liable for the untrue representations contained therein.

24.     Defendant Brian Williamson ("Williamson") was at all relevant times an Executive Officer of OAM and the Managing Director of the OGR Fund.  Defendant Williamson is specifically identified in the OGR Fund PPM as being an individual responsible for the Fund's management and investments, along with Defendant Patrick Kane.  In addition, Williamson actively solicited investors to invest in the OGR Fund, was a signatory to many of the Solicitation Documents and made key decisions with regards to the Fund's valuation of its assets.  Defendant Williamson's compensation from OAM was tied to total assets under his management and thus he directly profited when he successfully sought investments in the Fund.

25.     Defendant Patrick Kane ("Kane") was at all relevant times an Executive Officer of OAM and the Senior Managing Director of the OGR Fund.  Defendant Kane is specifically identified in the OGR Fund PPM as being an individual responsible for the Fund's management and investment, along with Defendant Williamson.  In addition, Kane is identified as a point of contact for investor inquiries in the Solicitation Documents.  Defendant Kane's compensation from OAM was tied to total assets under his management and thus he directly profited when he successfully sought investments in the Fund.

26.     Defendants Williamson and Kane are collectively referred to herein as the "Individual Defendants."

27.     Because of the Individual Defendants' position with the Company, they had direct knowledge of, and access to, undisclosed information about the true value of the OGR Fund's holdings, including the true value of the OGR Fund's Holdings in Cartesian.  Indeed, the Individual Defendants were the self-described "Investment Professionals" responsible for managing the OGR Fund's and the Individual Defendants were able to and did control the contents of the Solicitation Documents, being directly involved in producing, reviewing and/or disseminating these documents and, as alleged herein, were aware, or negligently disregarded, that the untrue information was being issued regarding the OGR Fund, and approved or ratified these statements, in violation of the federal securities laws.

28.     The OGR Fund, Corporate Defendants and the Individual Defendants are collectively referred to herein as "Defendants" or "Oppenheimer."

### IV.     NON-PARTIES

29.     Cartesian Investor-A is a private equity fund sponsored by Cartesian Capital Group, LLC.  Cartesian owns just one investment, shares in S.C. Fondul Proprietatea SAS.

30.     S.C. Fondul Proprietatea SAS is a closed-end fund set up by the Romanian government to benefit citizens whose property was expropriated during Communist Rule.

31.     Joon-Young Choi ("Choi") was at all relevant times a Senior Vice President of OAM and co-leader of the global private equity research for the OGR Fund.

32.     Sanfraz Lalani ("Lalani") was at all relevant times a Senior Vice President of OAM and, along with Mr. Choi, was co-leader of the global private equity research for the OGR Fund.

33.     Daniel Rhoads ("Rhoads") was at all relevant times a Vice President of Marketing for OAM and a member of the OGR Fund's due diligence team and responsible for investor relations.  Rhoads was also involved in marketing the OGR Fund to potential investors.

34.     Tyler Dritz ("Dritz") was at all relevant times an Executive Director of Marketing for OAM and was involved in the marketing of the OGR Fund to prospective investors.

35.     Eugene Lewis ("Lewis") was at all relevant times an Executive of OPCO and was involved in private equity research for the OGR Fund.

36.     Andrew Pietra ("Pietra") was at all relevant times either an Analyst or, after a promotion, an Associate Director of OAM, and also worked as an analyst for the OGR Fund.

37.     Daniel Galinko ("Galinko") was at all relevant times either an Analyst or, after a promotion, an Associate Director of OAM, and also worked as an analyst for the OGR Fund.

38.     Messrs. Choi, Lalani, Rhoads, Dritz, Pietra, Galinko and Lewis, are hereinafter collectively referred to as the "OGR Support Team" or "Support Team").

## V.     CONFIDENTIAL WITNESS

39.     "Confidential Witness" was a member of the OGR Support team.  Confidential Witness possesses information related directly to the Defendants' valuation of OGR Fund assets, including information regarding the true value of the Fund's holdings in Cartesian and the decision to inflate the value of these holdings.

## VI.     CLASS ACTION ALLEGATIONS

40.     Plaintiffs bring this action as a class action under the Securities Act pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of investors who purchased the interests in the OGR Fund pursuant to the materially untrue Solicitation Documents.

41.     The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable.  Although the exact number of Class members is unknown at this time and can only be ascertained through appropriate discovery, Plaintiffs know there are more than sixty Class members and likely hundreds of Class members who invested in the OGR Fund.

42.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

    (a)    whether Defendants violated the federal securities laws based upon the facts alleged herein;

    (b)    whether the Solicitation Documents contained untrue statements of material facts about the OGR Fund and the value of its assets;

    (d)    whether Defendants performed appropriate due diligence in advance of soliciting the relevant partnership interests in the OGR Fund; and

    (e)    the proper measure of damages.

43.     Plaintiffs' claims are typical of the claims of the members of the Class as Plaintiffs and members of the Class sustained damages arising out of the untrue statements contained in the Solicitation Documents in violation of federal law as complained of herein.

44.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

45.     A class action is superior to alternative methods for the fair and efficient adjudication of this controversy since joinder of all members of this Class is impractical. Furthermore, because the damages suffered by some individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members

individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.  BACKGROUND

### A.  The OGR Fund's Management Structure and Investment Strategy

46.     The OGR Fund was formed on September 24, 2007 as a Delaware Limited Partnership.  The OGR Fund is sponsored by Oppenheimer Asset Management, Inc., an SEC registered investment advisor.  The General Partner of the Fund is Oppenheimer Alternative Investment Management, LLC, an affiliate of the Sponsor and an SEC registered investment advisor.  The General Partner provides investment advisory services to the OGR Fund with the assistance of the Individual Defendants and the OGR Support Team.  The OGR Fund is administered by Oppenheimer & Co. Inc.  All of these parties were integral and necessary to successfully solicit investments into the Fund and directly profited from said solicitation efforts.

47.     The OGR Fund offered investors the opportunity to subscribe for Limited Partnership Units denominated in either Class A or Class B Units.  The OGR Fund's General Partner, OAIM, set the minimum investment for Class A Units at $500,000 and the minimum investment for Class B Units at $5,000,000.  These Limited Partnership Units were not registered under applicable securities laws and were offered privately pursuant to an exemption from registration under Section 4(2) of the Securities Act of 1933, as amended, Regulation D, promulgated thereunder by the SEC and applicable state securities laws.  In addition, investors in the Fund were require to be "accredited investors" as defined under Regulation D and "qualified purchasers" as defined under the Investment Company Action of 1940, as amended.

48.     The Limited Partnership Units are purchased through irrevocable capital commitments to the Fund.  Once the General Partner makes an investment decision, the OGR

13

Fund draws upon these commitments through capital calls.  The OGR Fund is a closed-end private equity fund-of-funds vehicle with a 10-plus year fund life.  *As such, limited investors have no mechanism by which to obtain liquidity for their investment (whether allocated to actual investments or awaiting a capital call) prior to the Fund's general liquidation*.

49.     Limited Partnership Units in the OGR Fund were offered to investors through the OGR PPM, which purports to establish the investment strategy of the OGR Fund and the principal terms of the partnership agreement with the limited investors.  As described in the OGR PPM, the strategy of the Fund was to:

> [O]ffer qualified investors access to a carefully selected, diversified portfolio of private equity and equity-investments focused on Natural Resource and Related Assets managed by experienced managers [  ] who we believe have demonstrated potential for superior performance.  The Fund seeks to achieve greater returns with less volatility than those historically generated by traditional financial assets such as investments in mutual funds, bonds and public securities and also offers investors inflationary protections and opportunity for diversification.

50.     Defendants Williamson and Kane are the "Investment Professionals" responsible for managing the OGR Fund's assets and investments with the advice and consent of the Corporate Defendants.  Defendants Williamson and Kane fulfilled their management duties with the assistance of the OGR Support Team whose responsibilities included marketing, monitoring, due diligence, accounting and reporting.  Defendants Williamson and Kane also actively and directly solicited investors to invest in the Fund for the purpose of monetary gain to both themselves individually (through compensation from their employer) and to the Corporate Defendants (through management fees).

**B.     The OGR Fund Invests Heavily in Fondul**

51.     Fondul was established by the Romanian government at the end of 2005 with the purpose of providing restitution to individuals whose property was wrongly confiscated under

communist rule.  Fondul shares are transferred to the aggrieved individuals in the process of converting compensation deeds into fund shares.  Compensation deeds are released to entitled holders in accordance with Romanian law.

52.     Fondul is organized as a joint stock company under Romanian law and is authorized to issue a maximum number of shares, the value of which is equal to the compensation that needs to be granted.  Fondul assets are mainly comprised of holdings in companies in the portfolio of Romanian public authorities.  Fondul shares have a nominal or "par value" of 1.0 RON, but these shares have always traded at a fraction of par value.  Indeed, throughout the Marketing Period, Fondul shares never traded anywhere close to their par value of 1.00 RON as demonstrated by the below chart:[5]



53.     The OGR Fund made a $7.0 million commitment to Cartesian in 2008.  The sole assets of Cartesian are shares of Fondul. Through its investment in Cartesian, the OGR Fund received 27.68 million shares in Fondul.  The OGR Fund's audited financial statements show that as of December 31, 2008, 41.3 percent of the OGR Fund's capital was invested in Cartesian. Because such a high percentage of the OGR Fund's capital was committed to Cartesian, any

---

[5] Unless otherwise stated, the trading values of Fondul cited herein are provided by Intercapital Invest, a Romanian-based financial investment services company which analyzed and tracked Fondul performance.

untrue statements regarding Cartesian had a massive and material effect on the OGR Fund's value and on potential investors' consideration of the Fund's profitability.

C.      **The Valuation Methodology for Cartesian/Fondul Changes in October 2009 as Part of a Marketing Initiative**

54.      The OGR Fund's holdings in Cartesian/Fondul were initially valued based upon the underlying fund manager's estimated value, which was based upon the "at cost" valuation supplied by Fondul's investment manager, Pangaea One, L.P. ("Pangaea").  This valuation was consistent with the OGR Fund's clearly articulated policy in the Solicitation Documents, which states: ***"the General Partner expects that in most cases it will value the Underlying Funds in accordance with the valuations reported to it by the Managers of the Underlying Funds,"*** and that ***"[a]s a fund of funds, we require our underlying fund managers to utilize third party valuation firms that provide valuations of the respective portfolios in accordance with FASB 157."***  Specifically, FASB 157 states that a ***"quoted price in an active market provides the most reliable evidence of fair value and shall be used to measure fair value whenever available."***

55.      Despite these clear representations, Defendants revised the valuation methodology for the Fund's holdings in Cartesian/Fondul ("the Revised Valuation Methodology") no later than October 29, 2009 in order to facilitate the marketing of the Fund to new investors such as Brockton and Quincy.  As Plaintiffs have learned through information and documents provided by Confidential Witness, the Revised Valuation Methodology (which was not disclosed to investors) was implemented by Defendant Williamson, who ordered the Cartesian holdings be valued at Fondul's par value of 1.00 RON.  At the time of Williamson's order, shares in Fondul were trading over-the-counter ("OTC") for less than 0.25 RON.

56.      The validity of the par valuation as it relates to Fondul is material to investors.  Par value of an equity security is a static measure that does not fluctuate with the market.  It does

not go up or down and bears no relationship to the fair market value of a security.  For example, Microsoft Corp. ("Microsoft") common stock, one of the most widely traded and held securities in the world, has a par value of $0.00000625 per share and a trading price on the NYSE (as of close of business June 19, 2012) of $30.70.  If a private equity fund were to have one share of Microsoft stock as its only holding, the fund's net asset value on June 19, 2012, under FASB and any other reasonable valuation method, would be $30.70.  Under Defendant Williamson's Revised Valuation Methodology, however, a fund holding a single share of Microsoft would be deemed to have a NAV of only $0.00000625.

57.     The use of par value in the Solicitation Documents was not a mathematical or transcription mistake.  In November 2009, a member of the OGR Support team was preparing materials for a potential client and used the correct, at cost valuation.  When the team member forwarded the documents to Defendant Williamson for approval prior to sending them to the potential investor, Williamson wrote:  "*[t]his doesn't include the mark up to Fondul?  I can take care of it and resend to Tyler [Dritz]*."

58.     Defendant Williamson later justified his decision to implement the Revised Valuation Methodology in a year-end Cartesian Valuation Memorandum dated May 19, 2010 (the "Valuation Memo").  Defendant Williamson acknowledged in this memorandum that his Revised Valuation Methodology was not tied to Cartesian's estimated value of its own holdings, stating, *inter alia*, as follows:

> *Beginning in Q3 2009, we began using a valuation methodology for Fondul which is based upon the face value of Fondul's shares* (taking into account currency fluctuations).  This methodology resulted in a valuation of $9.7 million versus a cost basis of $6.2 million in Q3 2009 for a 1.6x multiple of cost.  For Q4 2009, this methodology would result in a valuation of $9.3 million for a 1.5x multiple of cost.

17

*This unaudited valuation was independently derived by the OGR team without any input from the co-sponsor of this transaction, Cartesian Capital*.

59.     In large part, Williamson supported his Revised Valuation Methodology in this above-quoted memorandum by citing to a January 2010 Intercapital Invest Report ("Intercapital Report"), which he claimed had assigned a "fair market value" for Fondul shares of 0.7132 RON.    In fact, the 0.7132 RON figure in the Intercapital Report was a *target price* for Fondul shares and in no way an estimation of fair market value.   Additionally, the memorandum did not even mention Fondul's then-current OTC trading price of 0.25 RON.   Thus, the fact that the Fund claimed it would value the underlying funds in accordance with FASB 157 (which states that a "quoted price in an active market provides the most reliable evidence of fair value and shall be used to measure fair value whenever available") and then failed to do so evidences that the statements in the Solicitation Documents were materially untrue when made and omitted necessary facts that were needed to make the statements therein not materially untrue.

60.     Defendant Williamson subsequently modified the Valuation Memo and removed any further reference to the Intercapital Report's supposed fair market valuation of 0.7132 RON for Fondul shares.  Instead, Defendant Williamson based his Revised Valuation Methodology on the valuation he claimed was supposedly being utilized by another investor in Cartesian, in this case the private "DeVos Family Office", which was valuing its holding in Cartesian/Fondul at par value.  However, the Solicitation Documents state that asset values are to be based upon the valuation of the underlying fund's managers and/or upon actual trading value.  The Solicitation Documents do not state that asset values may be based on the carrying values utilized by other selected limited partners in the underlying funds.  A private family office that invested in the Cartesian fund does not market an investment product or solicit third-party investors and is therefore not subject to the same reporting requirements as the OGR Fund, if any.  Regardless,

according to Confidential Witness, he never saw any information regarding the DeVos Family Office's valuation of Cartesian nor did he believe that any OGR Support Team member saw such document and highly doubts that such a document even exists.

61.     In fact, the Revised Valuation Methodology distorted the value and internal rate of return for both the Cartesian/Fondul assets and the OGR Fund as a whole, turning what should have been reported as net losses and nominal gains into robust profits.  For example, mere weeks before releasing the Q1 2010 Report, the OGR Fund increased its holdings in Cartesian by approximately 15.8 million shares.  These shares were purchased for approximately $2.6 million, averaging out to nearly 0.50 RON per share.  Because they were immediately marked up to par value, however, this transaction increased the Cartesian valuation by approximately $5.2 million. The new shares thus generated a paper return of greater than 100 percent in a matter of weeks. Neither the OTC trading price nor the underlying asset manager's valuation reflected the basis for such an extreme appreciation in the shares of Fondul, and indeed there was none.  The OTC price of Fondul was steady over this time period, fluctuating on average between 0.40 RON and 0.50 RON.

### D.     Members of the OGR Support Team's Concerns about the Revised Valuation Methodology Go Unheeded by OAM and OPCO Management

62.     As early as May, 2010, Williamson attempted to justify the use of Revised Valuation Methodology to the OGR Support Team.  He stated that "Cartesian's valuation methodology for its Pangaea fund [the fund which managed the Fondul assets] is 'their' interpretation."  Williamson also attempted to convince the Support Team that the OGR Fund was justified in marking up the Fondul asset because co-investor DeVos Family Office was using par value for their internal reports.  This flawed logic of "everyone else is jumping off the bridge so we should do it too" did not convince the OGR Support Team, at least some of which

complained to Williamson about the Revised Valuation Methodology and/or alerted senior OAM and OPCO executives to the issue.

63.     Indeed, as revealed by Confidential Witness, certain members of the OGR Support Team were concerned with the change in valuation methodology and noted that the timing of said change had apparently been implemented solely to solicit new investors in the Fund.  These concerns were brought to the attention of OAM and OPCO executives on multiple occasions and Defendants were encouraged to address the situation through an independent audit of the Fund and a restatement and/or notification to those investors who received the Solicitation Documents.   No such remedial action ever occurred.

64.     In fact, on June 24, 2011, following the conclusion of the Marketing Period, one Support Team member sent an email directly to Albert Lowenthal – Chairman of the Board and Chief Executive Officer of Oppenheimer Holdings Inc. – alerting him to Defendants' negligent actions.  More specifically, the email, with the subject line "OGR PE Fund Valuation Practice Concerns", states, in part, as follows:

> Mr. Lowenthal:
>
> I decided to reach out to you directly as I have received no response, written notification of my status, or any feedback related to the purported investigation that was apparently conducted by Mr. McGuire following my abrupt, groundless and seemingly retaliatory suspension/dismissal from Oppenheimer on May 31, 2011.
>
> ***I now believe it personally prudent to make you and the compliance officer of the Board aware of the details of the very sensitive information I repeatedly conveyed to my supervisor, Brian Williamson, Managing Director, though to little avail.*** Additionally, I believe the following matters, as well as witnessed conversations where I expressed my concerns about the proposed joint spin-out with Tyler Dritz and Ben Posen, to be the real basis for his actions against my employment and not the groundless and contradictory rationale given. I do not deserve the tarnish this arbitrary and capricious action will undoubtedly cause to my reputation and career, if not satisfactorily reconciled.

*I made multiple internal attempts to encourage a remedy of this situation by requesting an independent audit, accurate restatement and/or notification of institutional investors, consultants and brokers who relied on the misstated valuation OPCO provided for their investment decisions*. Knowing most of these brokers and institutional investors personally, if they were to learn that this information was known and not properly disclosed, I am certain their confidence in Oppenheimer would diminish substantially, to say the least.

In the Notes to Consolidated Financial Statements in the OPPENHEIMER HOLDINGS, INC. 2010 Annual Report, it states, "In its role as general partner in certain hedge funds and private equity funds, the Company, through its subsidiaries, holds direct investments in such funds. The Company uses the net asset value of the underlying fund as a basis for estimating the fair value of its investment."

In June 2008, Oppenheimer Global Resource Private Equity Fund, L.P. ("OGR") invested in shares of Fondul Proprietatea ("Fondul"), an investment fund set up by the Romanian Government to compensate persons whose properties were abusively seized by the prior communist regime. OGR made a $7 million investment in Fondul through a fund called Cartesian Investors-A, L.P. ("Cartesian"). Through the investment in Cartesian, OGR received 27.68 million Fondul shares. Prior to Fondul's 2010 listing on the Bucharest Stock Exchange (BSE), the shares were traded OTC.

*Prior to Q3 2009, OGR's investment in Cartesian had been held at a value consistent with OGR's valuation footnote on its financial statements, which states "Net Asset Values are based on the underlying managers' estimated values" and Oppenheimer Holdings' stated private equity valuation policy, which states "The Company uses the net asset value of the underlying fund as a basis for estimating the fair value of its investment." Prior to Q3 2009, Cartesian, and therefore OGR, held the investment at cost.*

*For the Q3 2009 OGR financial statements and quarterly report, Oppenheimer applied a new valuation methodology for its investment in Cartesian. This methodology applied the number of Fondul shares held through Cartesian multiplied by the par value of the shares (RON 1.00 each). This resulted in a 60% markup in the stated value of the investment to 1.6x the initial cost. . . . For the same period ended 9/30/2009, Cartesian held the investment at cost . . . . OGR's valuation footnote on its 9/30/2009 financial statements remained "Net Asset Values are based on the underlying managers' estimated values." However, this was not the case. OGR held the investment at 1.6x cost, while the underlying manager, Cartesian, held the same investment at cost.*

*For Q3 2009, OGR valued its investment in the Cartesian fund approximately 60% above Cartesian's holding value.*

Note that, as of 9/30/2009, Cartesian was OGR's largest investment and represented over 35% of the fund's invested capital. ***Without any doubt, marking up an investment which represents over 35% of the fund's invested capital by approximately 60% had a material impact on the stated performance of the OGR fund***. For the Q4 2009 OGR financial statements and quarterly report, Oppenheimer continued to apply the same valuation methodology multiplying the number of Fondul shares held through Cartesian by the par value of the shares (RON 1.00). The resulting value of the Cartesian investment in Q4 2009 was 1.5x cost (varying only slightly from the Q3 2009 valuation due to exchange rate fluctuations between the USD and RON. . . .   Note that the Cartesian Q4 2009 financial statements assigned a value of ~1.2x cost for its investment in Fondul shares. . . . Again, OGR's valuation footnote on its 12/31/2009 financial statements remained "Net Asset Values are based on the underlying managers' estimated values." ***However, this was not the case. OGR held the investment at 1.5x cost, while the underlying manager, Cartesian, held the same investment at ~1.2x cost***. As a result, the OGR fund's share of Cartesian's total US GAAP (Fair Value) NAV of $15,769,427 . . . (Provided by Cartesian) did not reconcile with the stated NAV in OGR's year-end report. . . .

Further, according to . . . [an] Intercapital Invest research report Fondul's "Current OTC Trading Price" was RON 0.2500. ***Additionally, Intercapital Invest's "Target Price" for Fondul was RON 0.7132. OGR's RON 1.00 per share valuation was well in excess of both the OTC trading price and the research report's target price***. . . .

Mr. Williamson's justification for the use of the RON 1.00 par value for Fondul shares was noted in the attached year end Cartesian Valuation Memo dated May 19, 2010. . . . The Fondul valuation methodology used was not in any way based on Cartesian's estimated value (as the year-end OGR footnote states it was). ***In fact, the Intercapital Invest research report's RON 0.7132 "Target Price" was even cited as the "Fair Market Value" of the Fondul shares within the memo***.

***Mr. Williamson ultimately decided to use what he referred to as the "Face Value" of RON 1.00 in order to support a valuation that is approximately 40% greater than what he personally defined as the "Fair Market Value" within the memo.***

The memo also illustrates that using Intercapital Invest's "Target Price" (or what Mr. Williamson referred to as the "Fair Market Value") of RON 0.7132 would result in a value of 1.1x cost for the overall Cartesian investment. Additionally, the memo did not even mention Fondul's "Current OTC Trading Price" of RON 0.25. ***Use of the observable "Current OTC Trading Price" (which would represent a level 1 or 2 measurement in Oppenheimer's stated valuation hierarchy) would have resulted in a year-end valuation of 0.4x cost for the overall investment, representing an approximate 60% loss for the Cartesian investment***.

*For Q4 2009, OGR valued its investment in the Cartesian fund approximately 25% above Cartesian's stated holding value and approximately 300% above the OTC trading price of the underlying Fondul shares*.

In 2010, weeks before the Q1 2010 quarterly report was released, OGR increased its holdings in Cartesian, adding another approximately 15.8 million Fondul shares at a cost of approximately RON 0.50 per share. *This increased the total cost basis of the Cartesian investment by approximately $2.6 million. On the Q1 2010 quarterly report, that new block of Fondul shares increased the Cartesian valuation by approximately $5.2 million. To clarify, weeks prior to the Q1 2010 quarterly reporting date, OGR acquired 15.8 million additional Fondul shares for approximately $2.6 million (or approximately RON 0.50 per share) and immediately marked them up to $5.2 million (or RON 1.00 per share) for reporting purposes. On the OGR quarterly report, the new incremental block of shares generated a greater than 100% return in a matter of weeks, while the OTC trading price did not reflect any such appreciation in value*. Still Mr. Williamson relied on the attached Cartesian Valuation Memo to justify his decision to mark the entire Cartesian investment up to 1.7x cost for Q1 2010. . . .

*These inflated values were highlighted in the fund's performance and regularly used to attract new investors into the fund. OGR [r]aised over $61 million in closings that occurred on or after 9/30/2009 from sixty investors, including wealthy individuals, Oppenheimer brokers, university endowments and public pension funds*. One of the key considerations these investors analyzed prior to making an investment in OGR was the fund's performance to date.  Though I was uninvolved with the selling of OGR, I would surmise these investors were buying into the fund with what they believed were "embedded gains". However, utilizing the Cartesian's "at cost" 9/30/2009 valuation or Fondul's OTC trading price of RON 0.25, they were really investing in a fund with "embedded losses".

Fondul is currently trading on the highly liquid Bucharest Stock Exchange; its trading value has appreciated substantially since Q3 2009. As of yesterday's close, the shares are trading at RON 0.52 (approximately half of the RON 1.00 par value that Mr. Williamson has used since Q3 2009). Despite the recent rise in trading value associated with Fondul's BSE listing, the overall investment is down approximately 10% to date.

I have shared this information in redacted form and in strict confidence with a past Chairman of an authoritative accounting standards board. *Based on the fully redacted information I provided to him, he likewise concluded that there appeared to be wrongdoing*. He expressed concern for my situation and dismay that a publicly traded company had handled this matter in this way. He has recommended that I resign from my position, retain an attorney and submit this evidence to the SEC.

Prior to my separation, I was proud and grateful to be on the Oppenheimer team. As you may be aware, I received multiple glowing performance reviews, rapid promotions and significant bonuses immediately prior to my abrupt departure. I was also able to defend and completely dispel with incontrovertible evidence the false, contrived accusations of any wrongdoing on my part. For that reason, I am appealing to you personally to initiate and arrive at an ethical and mutually satisfactory resolution.

*     *     *

A hard-copy version of this letter and all supporting materials will be mailed to your office at 125 Broad Street.

65.     While the concerns expressed by the OGR Support Team did not result in any remedy to investors who relied upon the OGR Fund's materially untrue valuation of the Cartesian/Fondul assets, it did apparently result in the eventual dismemberment of the Support Team.  Seven members of the OGR Support Team left OAM or OPCO between March 2011 and July 2011, including Messrs. Choi, Rhoads, Dritz, Pietra, Galinko, and Lewis.   In addition, Defendant Kane resigned his position with OAM in May 2011 and Defendant Williamson left OAM in the fall of 2011.

## VIII.   SUBSTANTIVE ALLEGATIONS

### A.     The Solicitation Documents for the OGR Fund Advised Investors as to the Valuation Methodology to be Used for the Fund's Underlying Assets

66.     The OGR PPM, which details the OGR Fund Strategy and key terms of the limited partnership agreement, provided potential investors with detailed information regarding the valuation of the OGR Fund's holding.  In particular, the OGR PPM purports that it will "***rely on the Underlying Fund's valuation of portfolio companies and such [private equity] investments***.  The OGR PPM further states:

> A prospective fund's performance can differ drastically based on how it accounts for unrealized investment values… We look for **consistent application of a conservative valuation methodology when valuing unrealized investments.  We test an Underlying Fund's valuation approach by comparing it to public market comparables and/or other**

*Oppenheimer Global Resource Private Equity Fund I, L.P. private comparables, to the extent available to evaluate their accuracy. From time to time, we may consult with a valuation expert to better assess an Underlying Fund's unrealized investment valuations.*

67.     Contrary to the representations made in the Solicitation Documents, Defendants, as discussed herein, did not use a conservative valuation methodology and did not value the underlying funds by comparing it to public market comparables.

**B.     Defendants' Materially Untrue Statements Regarding Its Valuation Policy and the Value of OGR Fund Assets**

68.     After the change in valuation policy and the implementation of Defendant Williamson's Revised Valuation Methodology, Defendants responded to potential investors' requests for information and reiterated and emphasized the valuation policies stated in the OGR Fund PPM, which were no longer operative.   For example, in a response to an investor dated October 29, 2009, (the "October 29, 2009 Response") Defendants stated, in pertinent part, that:

*As a fund of funds, we require our underlying managers to utilize third party valuation firms that provide valuations of the respective portfolios in accordance with FASB 157.*   These valuations are then reviewed by their respective independent auditors.  As a fund of funds, we also utilize a third party valuation provider in conjunction with our outside auditors annual audit process.

69.     FASB 157 states that a *"quoted price in an active market provides the most reliable evidence of fair value and shall be used to measure fair value whenever available."*

70.     Defendants, however, failed to value the assets of the OGR Fund in accordance with FASB 157.  They disregarded the "quoted price in an active market" and valued the Cartisian Fund through unorthodox and undisclosed methods. As such, the statement that the OGR Fund valued its assets in accordance with FASB 157 was materially untrue when made.

71.     Moreover, the October 29, 2009 Response contains a chart featuring materially inflated values for the OGR Fund's holdings in Cartesian/Fondul for the Q2 2009:

**Oppenheimer Global Resource Private Equity Fund**
**June 30, 2009**

| Fund Name | Commitment Date | Committed Capital | Contributed Capital | % Capital Contributed | Realized Proceeds | Net Asset Value* | Multiple | IRR (%) |
|---|---|---|---|---|---|---|---|---|
| Blue Tip Energy Partners Fund I, L.P. | Apr-08 | $ 7,000,000 | $ 2,403,032 | 34% | $ 10,613 | $ 2,118,146 | 0.9x | -13.1% |
| Cartesian Investors-A, L.P. | Jun-08 | $ 7,000,000 | $ 6,196,464 | 89% | $ 95,313 | $ 9,272,956 | 1.5x | 67.0% |
| Starwood Energy Infrastructure Fund I, L.P. | May-08 | $ 7,000,000 | $ 1,050,000 | 15% | $ - | $ 950,947 | 0.9x | -18.3% |
| Tripod Capital China Fund II, L.P. | Oct-08 | $ 7,000,000 | $ 4,210,874 | 60% | $ - | $ 4,999,930 | 1.2x | 40.0% |
| **Total** | | **$ 28,000,000** | **$ 13,860,370** | **50%** | **$ 105,926** | **$ 17,341,979** | **1.3x** | **38.3%** |

* Unrealized Values are based on the underlying managers' estimated values as of June 30, 2009.
OGR valuation represents the reported value of the underlying funds less OGR fees and expenses but does not represent the actual realized performance of OGR.
Past performance is no guarantee of future results.

72.     The above chart showed NAV of $9.27 million and an IRR of 67.0 percent for the Fund's Cartesian/Fondul assets.  The chart also reports a 38.3 percent IRR for the OGR Fund as a whole.  A footnote to this chart states that NAVs "are based on the underlying managers' estimated values as of June 30, 2009."

73.     The NAV and IRR figures reported in the October 29, 2009 Report were materially untrue when made because these numbers were not based upon the underlying manager's estimated value of the Cartesian/Fondul in accordance with either the valuation used by the underlying fund manager or in accordance with FASB 157.  Instead, Defendants changed their valuation methodology for the Fund's holdings in Cartesian/Fondul in October 2009 to assign par value to the Fondul shares.  In doing so, Defendants overvalued the NAV and IRR for both its Cartesian/Fondul holdings and the OGR Fund as a whole.   Indeed, the underlying fund manager maintained the Fondul investment at cost, which would have resulted in a *negative* IRR of 6.8 percent for the OGR Fund as a whole.

26

**C.      Defendants Distributed to *Potential* Investors a Materially Untrue Q2 2009 Quarterly Report for the OGR Fund which was Materially Different from the Q2 2009 Report issued to *Curren*t Investors**

74.      On October 7, 2009, Defendants distributed to ***current*** investors in the OGR Fund the Q2 2009 Report, consisting in part of a cover letter and the Quarterly Investor Update for 2nd Quarter 2009 and a more detailed performance breakdown specific to each fund.  The Q2 2009 Report contained the following chart:

| Oppenheimer Global Resource Private Equity Fund June 30, 2009 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Fund Name** | **Commitment Date** | **Committed Capital** | **Contributed Capital** | **% Capital Contributed** | **Realized Proceeds** | **Net Asset Value\*** | **Net Multiple** | **Net IRR (%)** |
| Blue Tip Energy Partners Fund I, L.P. | Apr-08 | $  7,000,000 | $  2,403,032 | 34% | $    10,613 | $  2,118,146 | 0.9x | -13.1% |
| Cartesian Investors-A, L.P. | Jun-08 | $  7,000,000 | $  6,196,464 | 89% | $    95,313 | $  6,050,690 | 1.0x | -1.0% |
| Starwood Energy Infrastructure Fund I, L.P. | May-08 | $  7,000,000 | $  1,050,000 | 15% | $         - | $    950,947 | 0.9x | -18.3% |
| Tripod Capital China Fund II, L.P. | Oct-08 | $  7,000,000 | $  4,210,874 | 60% | $         - | $  4,999,930 | 1.2x | 40.0% |
| Total - Net to Fund | | $ 28,000,000 | $ 13,860,370 | 50% | $  105,926 | $ 14,119,713 | 1.02x | 3.8% |
| | | | | | | Net to Limited Partners | 0.95x | -6.3% |

\* Net Asset Values are based on the underlying managers' estimated values as of June 30, 2009.

75.      As this chart shows, as of June 30, 2009, ***current*** investors in the OGR Fund were informed that the Cartesian fund showed an IRR of -1% and a NAV of $6,050,690.  This valuation reflected the underlying fund manager's at-cost valuation of the Fondul shares in accordance with FASB 157.  Using this valuation of Cartesian, and through it Fondul, the OGR Fund displayed a net loss to investors of -6.3%.  The Q2 2009 Report stated that NAVs "are based on the underlying managers estimated values as of June 30, 2009."

76.      Within weeks of the Q2 2009 Report's release, and without informing investors, Defendant Williamson negligently changed the valuation methodology for the Cartesian holdings in order to facilitate the marketing of the OGR fund to ***new*** investors.  Defendant Williamson did this by negligently valuing the Cartesian holdings at their par value of 1.00 RON, while Fondul shares were trading over-the-counter for less than RON 0.25.

77.     Defendants then began to market the OGR Fund using Defendant Williamsons'
Revised Valuation Methodology for the Fund's Cartesian Holdings.   In a 2009 PowerPoint
presentation entitled "Oppenheimer Global Resource Private Equity Fund I, L.P. A Private
Placement" (the "Q2 2009 Presentation"), Defendants utilized the Revised Valuation
Methodology and reported the following to potential investors:

**Oppenheimer Global Resource Private Equity Fund**
**June 30, 2009**

| Fund Name | Commitment Date | Committed Capital | Contributed Capital | % Capital Contributed | Realized Proceeds | Net Asset Value* | Multiple | IRR (%) |
|---|---|---|---|---|---|---|---|---|
| Blue Tip Energy Partners Fund I, L.P. | Apr-08 | $ 7,000,000 | $ 2,403,032 | 34% | $ 10,613 | $ 2,118,146 | 0.9x | -13.1% |
| Cartesian Investors-A, L.P. | Jun-08 | $ 7,000,000 | $ 6,196,464 | 89% | $ 95,313 | $ 9,272,956 | 1.5x | 67.0% |
| Starwood Energy Infrastructure Fund I, L.P. | May-08 | $ 7,000,000 | $ 1,050,000 | 15% | $ - | $ 950,947 | 0.9x | -18.3% |
| Tripod Capital China Fund II, L.P. | Oct-08 | $ 7,000,000 | $ 4,210,874 | 60% | $ - | $ 4,999,930 | 1.2x | 40.0% |
| Total | | $ 28,000,000 | $ 13,860,370 | 50% | $ 105,926 | $ 17,341,979 | 1.3x | 38.3% |

* Unrealized Values are based on the underlying managers' estimated values as of June 30, 2009.

78.     This chart is in nearly all ways identical to the chart featured in the Q2 2009
Report.  It offers OGR Fund performance up to June 30, 2009.  It contains identical values for
Blue Tip Energy Partners Fund I, L.P., Starwood Energy Infrastructure Fund I, L.P., and Tripod
Capital China Fund II, L.P. and contains a footnote stating that NAVs "are based on the
underlying managers' estimated values as of June 30, 2009."   However, one difference is
immediately apparent and blindingly clear:  Cartesian shows an IRR of ***positive 67 percent***,
rather than ***negative 1%*** and an asset value of $9.27 million instead of $6.05 million.  Using
these numbers, the OGR Fund as a whole shows a ***positive*** IRR of 38.3 percent rather than a
***negative*** IRR of 6.3 percent.  The valuations and returns all changed, despite the fact that this
chart involved the same assets over the same time period and should have involved the same
returns.

28

79.     The increase in Cartesian's IRR set forth in the Q2 2009 Presentation was not the result of any change in valuation by the underlying manager of the asset.   The underlying manager of the fund continued to value the fund at cost.   The increase also had nothing to do with a sudden or direct change in market price.   The average OTC price of Fondul, according to a historical price index released by Intercapital Invest, increased slightly in Q2 2009, but remained well below the trading levels of April and August 2008, when the OGR Fund bought into Cartesian.   The change was the result of Defendant Williamson negligently valuing the investment at *par value* in order to show a higher rate of return.   Fondul has never, in either its OTC history dating back through 2007 nor in its history of being traded on the Bucharest Stock Exchange ("BvB") since January 2011, traded on any exchange at par value.

80.     The Q2 2009 Presentation was materially untrue when made because it explicitly stated that NAV would be based "on the underlying managers' estimated values as of June 30, 2009."   The underlying fund manager maintained the Fondul investment at cost, which would have shown a loss of 1.0%.   This valuation is what OAM and the OGR Fund used in generating the numbers distributed to their current investors.   The change in valuation of Cartesian from the Q2 2009 Report to the creation of the Q2 2009 Presentation was made to show embedded gains in the OGR Fund and thus make it more attractive to potential investors.   The OGR Fund was in the midst of marketing with the purpose of increasing the fund's capital base.

**D.     Defendants Distributed a Materially Untrue Q3 2009 Report for the OGR Fund**

81.     Defendants continued to use Williamson's negligently prepared Revised Valuation Methodology and inflated the value of the Fund's Cartesian holdings throughout the

remainder of the Marketing Period.[6]  On January 5, 2010, Defendants distributed the OGR

Fund's Q3 2009 Quarterly Package (the "Q3 2009 Report").

82.     The Q3 2009 Report again shows Cartesian as the star performer of the OGR

Fund.  The net IRR for Cartesian/Fondul is listed as 53.5 percent and its NAV is listed as $9.67

million.  This valuation allowed the OGR Fund to show a total net IRR of 31.8 percent, with a

net IRR to the investors of 10.1 percent.  Again, the NAV is purported to be "based on the

underlying managers' estimated values."

83.     The Q3 2009 Report was materially untrue because it negligently utilized

Williamson's Revised Valuation Methodology which attributed par value to the Fund's holdings

in Cartesian/Fondul, and not the underlying manager's estimated values.  Indeed, Pangaea, the

underlying asset manager of the Cartesian Fund, did not use par value in calculating the NAV of

its Fondul holdings and valued these holdings at cost.  By assigning par value, a static metric of

little to no use in determining the true value of an equity security, Defendants negligently

inflated the valuation of Cartesian as to the true value and performance of the investment.

   **E.     Defendants Distributed a Materially Untrue Q4 2009 Report for the OGR
           Fund**

84.     On June 2, 2010, Defendants distributed the OGR Fund's Q4 2009 Quarterly

Package (the "Q4 2009 Report").  The Q4 2009 Report again showed Cartesian as the star

performer of the OGR Fund.  The net IRR for Cartesian/Fondul is listed as 37.8 percent and its

NAV is listed as $9.3 million.  This valuation allowed the OGR Fund to show a total net IRR of

21.0 percent, with a net IRR to the investors of 3.5 percent.  Again, the NAV is purported to be

"based on the underlying managers' estimated values."

_____

[6] Subsequent to October 29, 2009 and throughout the Marketing Period, Defendants used the Revised Valuation
Methodology for both current and existing investors.

85.     The Q4 2009 Report was materially untrue when issued because it utilized Williamson's negligently prepared Revised Valuation Methodology which attributed par value to the Fund's holdings in Cartesian/Fondul, and not the underlying manager's estimated values, which was ~1.2x cost for that quarter.  By assigning par value to the Cartesian/Fondul assets, Defendants inflated the valuation of Cartesian.

**F.      Defendants Distributed a Materially Untrue Q1 2010 Report for the OGR Fund to Investors**

86.     On July 21, 2010, Defendants distributed the OGR Fund's Q1 2010 Quarterly Package (the "Q1 2010 Report").  The cover letter states that the OGR Fund held its final closing on June 30, 2010 and contained $140 million in total capital commitments.  Cartesian remained by far the investment with the greatest share of committed capital.  The Q1 2010 Report represented approximately 40 percent of the OGR Fund's contributed capital.  It showed a NAV for Cartesian of $14.3 million for a net multiple of 1.7x cost and a net IRR of 52.6%.  The NAV again is claimed to be "based on the underlying managers' estimated values."   Cartesian represented over 50 percent of the NAV for the fund.

87.     Mere weeks before releasing the Q1 2010 Report, the OGR Fund increased its holdings in Cartesian by approximately 15.8 million shares.  ***These shares were purchased for approximately $2.6 million, averaging out to nearly 0.50 RON per share.  Because they were immediately marked up to par value, this transaction increased the Cartesian valuation by approximately $5.2 million.  The new shares thus generated a paper return of greater than 100 percent in a matter of weeks.***

88.     The Q1 2010 Report was materially untrue when issued because it was based upon Williamson's negligently prepared Revised Valuation Methodology which assigned par value to the Fondul shares.  Neither the OTC trading price nor the underlying asset manager

31

reflected the basis for such an appreciation in the shares of Fondul and indeed there was none. The OTC price of Fondul was steady throughout the Marketing Period, fluctuating on average between 0.40 RON and 0.50 RON. The underlying asset manager held Cartesian at 1.2x cost, far less than the 1.7x multiple employed by the OGR Fund. Valuing the investment at the OTC price, as should have been done under FASB 157, would have shown *a net IRR loss*. Valuing Cartesian at the underlying fund managers' rating of 1.2x cost would have resulted in a meager 7 percent gain to the Fund's total IRR.

## IX.    GOVERNMENT INVESTIGATIONS

89.    A February 24, 2012 article in THE WALL STREET JOURNAL reported that the SEC and the Massachusetts Attorney General's Office were investigating the OGR Fund since the fall of 2011, sending multiple subpoenas to the OGR Fund's employees and to OAM. The investigations have focused on whether the OGR Fund has been incorrectly accounting for its investments. As described in the article:

> [F]ederal regulators and the Massachusetts attorney general are investigating whether a fund that was part of Oppenheimer Holdings, Inc. [ ] overstated the value of one of its holdings, according to people close to the matter.
>
> The potential exaggeration in the fund grew to more than $4 million, according to documents shared with Oppenheimer investors. The bulk of this markup came as the fund was reaching out to potential investors in the fall of 2009, and helped push the fund's reported internal rate of return to 38%, after fees, from a loss of 6.3%. The fund subsequently raised more than $55 million from individuals and various institutions.
>
> *            *            *
>
> The SEC and Massachusetts attorney general have been investigating Oppenheimer fund since at least the fall, according to people close to the matter. Multiple subpoenas have been issued to various employees who worked at the private-equity unit, these people say.

90.    Then, in Oppenheimer Holding Inc.'s SEC Form 10-K, filed March 6, 2012,

Oppenheimer Holding Inc. disclosed that it has been responding to information requests from the SEC and the Massachusetts Attorney General's Office since October 2011 regarding the OGR Fund and that on February 24, 2012, the United States Attorney's Office for Massachusetts (Boston) informed Oppenheimer Holdings Inc. and OAM that it intends to seek information regarding the OGR Fund.

## X.    ADDITIONAL SUBSTANTIVE ALLEGATIONS

91.    One of the private equity funds operated by Cartesian Capital Group ("CCG") is Cartesian Iris 2009B, L.P. ("Cartesian Iris").  In its Form D, filed with the SEC on July 15, 2009, OPCO is listed as having received compensation from Cartesian Iris for its role as a sales agent in other funds controlled by CCG, a material fact not disclosed in the Solicitation Documents. Peter Yu, listed as Executive Officer of Cartesian Iris, was also heavily involved in Cartesian and corresponded with Defendant Williamson.  As such, the Solicitation Documents were materially incomplete because this fact should have been disclosed.  Indeed, this material omission led investors to believe that the assets held by the OGR Fund were independent when, in fact, a symbiotic relationship existed between the OGR Fund's parent and CCG and its personnel.

## X.    LOSS CAUSATION

92.    After the end of the Marketing Period, Oppenheimer went back to using the underlying manager's values and the fund's performance has correspondingly fallen to the single digits (negative performance on a net basis).  Unfortunately, OGR is a ten-year closed-end vehicle meaning that investors have no mechanism by which to obtain liquidity such as through redemptions.  Investors are essentially "trapped" in the fund and are unable to pull their capital contributions even though they have lost all confidence in the Fund and its managers.

93.     Fondul is currently trading on the highly liquid Bucharest Stock Exchange; its trading value has appreciated substantially since Q3 2009.   According to Bloomberg.com, Fondul shares are trading at RON 0.456 as of the date of this Complaint (less than half of the RON 1.00 par value that Defendant Williamson negligently used for marketing purposes since Q2 2009). Despite the recent rise in trading value associated with Fondul's BvB listing, the overall investment is down significantly over the corresponding period.

94.     Fondul represented more than half of the fund's NAV as of June 30, 2009 and continues to be a substantial portion of the Fund as of the date of this Complaint.  As a result of the materially untrue statements in the Solicitation Documents, Plaintiffs and other Class members bought Limited Partnership Units with significant imbedded losses at an inflated value. As such, they were damaged by these misstatements, did not receive the benefit of their bargain with Defendants, and are accordingly damaged and entitled to rescind their investment *in toto*.

## XI.     NO SAFE HARBOR

95.     The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly untrue statements pled in this Complaint.  The statements alleged to be untrue herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be untrue may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## COUNT I
### (Against All Defendants)
### Violations of Section 12(a)(2) of the Securities Act

96.     Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein.

97.     This Count is asserted against Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise invested in the OGR Fund pursuant to the Solicitation Documents.

98.     Plaintiffs expressly exclude and disclaim any allegations that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on theories of strict liability and negligence under the 1933 Act.

99.     Defendants were sellers, offerors, and/or solicitors of sales of securities offered pursuant to the Solicitation Documents.  Defendants actively solicited investment in the OGR Fund offered pursuant to the Solicitation Documents and did so for monetary gain.   The Solicitation Documents contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.

100.    Plaintiffs and other members of the Class who purchased or otherwise acquired investment in the OGR Fund pursuant to the materially untrue Solicitation Documents did not know and in the exercise of reasonable diligence could not have known of the untrue statements and omissions contained in the Solicitation Documents.

101.    Defendants owed to Plaintiffs and other members of the Class who purchased or otherwise acquired an investment stake pursuant to the materially untrue Solicitation Documents the duty to make a reasonable and diligent investigation of the statements contained in the

Solicitation Documents, to insure such statements were true and that there was no omission of material fact necessary to prevent the statements contained therein from being untrue. Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Solicitation Documents were true and without omissions of any material facts and were not misleading. By virtue of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act.

102.     Plaintiffs, individually and representatively, hereby offer to tender to Defendants those interests which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such interests, in return for the consideration paid for those interests together with interest thereon.

**COUNT II**
**(Against the Individual Defendants)**
**Violations of Section 15 of the Securities Act**

103.     Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein.

104.     This Count is asserted against the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who purchased or otherwise acquired interests in the OGR Fund. Plaintiffs expressly exclude and disclaim any allegations that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

105.     At all relevant times, the Individual Defendants were controlling persons of the OGR Fund within the meaning of Section 15 of the Securities Act. Each of the Individual Defendants served as a manager and/or director of the OGR Fund prior to and at the time of the

interests being solicited and sold.  Each of the Individual Defendants at all relevant times participated in the operation and management of the OGR Fund, and conducted and participated, directly and indirectly, in the conduct of the OGR Fund's business affairs.  As such, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the OGR Fund.  By reason of the aforementioned conduct, the Individual Defendants are liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as, Defendants to Plaintiff and the other members of the Class.

**COUNT III**
**(Against the Corporate Defendants)**
**Violations of Section 15 of the Securities Act**

106.    Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein.

107.    This Count is asserted against the Corporate Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who purchased or otherwise acquired interests in the OGR Fund.  Plaintiffs expressly exclude and disclaim any allegations that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

108.    At all relevant times, the Corporate Defendants were controlling persons of the OGR Fund within the meaning of Section 15 of the Securities Act.  Each of the Corporate Defendants at all relevant times participated in the operation and management of the OGR Fund, and conducted and participated, directly and indirectly, in the conduct of the OGR Fund's business affairs.  As such, the Corporate Defendants had a duty to disseminate accurate and truthful information with respect to the OGR Fund.  Based on the Corporate Defendants'

37

positions and associations with the Fund, Plaintiffs and the Class could not have been injured absent the express and direct participation of the Corporate Defendants.  By reason of the aforementioned conduct, the Corporate  Defendants are liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as, Defendants to Plaintiff and the other members of the Class.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment as follows:

(a)     Determining this action to be a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding rescission of the Plaintiffs' and other class members' investment in the OGR Fund as a result of Defendants' conduct, together with interest thereon;

(c)     Awarding Plaintiffs and the class damages, plus all interest thereon, for the depreciation in the value of their OGR Fund investment if rescission is not awarded;

(d)     Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys and experts;

(e)     Granting such other and further relief as the Court may deem just and proper.

### VIII.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  June 20, 2012                                    **BLOCK & LEVITON LLP**


By:    _____/s/ Jason M. Leviton_____
       Jeffrey C. Block (BBO #600747)
       Jason M. Leviton (BBO #678331)
       Mark A. Delaney (BBO #652194)
       155 Federal Street, Suite 1303
       Boston, MA  02110
       Telephone:  (617) 542-8300
       Facsimile:  (617) 542-1194

       *Counsel for Lead Plaintiffs and Lead*
       *Counsel*

Michael Sacco (BBO #562006)
**THE LAW OFFICES OF MICHAEL SACCO**
P.O. Box 479
Southampton, MA 01073
Telephone:  (413) 642-3576
Facsimile:  (413) 642-5278

*Counsel to Plaintiff Quincy Contributory*
*Retirement Systems*